IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
January 8, 2019 Session

## STATE OF TENNESSEE v. CHARLES BURROW

**Appeal from the Criminal Court for Shelby County**
**No. 16-05674      Glenn Ivy Wright, Judge**

_____

**No. W2018-00374-CCA-R3-CD**

_____

A Shelby County jury convicted the defendant, Charles Burrow, of three counts of second degree murder, one count of first degree murder, one count of attempted first degree murder, one count of aggravated criminal trespass, and one count of employing a firearm during the commission of a dangerous felony. Following a sentencing hearing, the trial court imposed an effective sentence of life imprisonment plus six years. On appeal, the defendant challenges the sufficiency of the evidence to support his convictions. The defendant also contends the jury's verdicts are inconsistent and requests plain error review of improper statements by the prosecutor. After reviewing the record and considering the applicable law, we affirm the judgments of the trial court. However, we remand the case for corrected judgment forms in Counts one, two, three, four, and five.

**Tenn. R. App. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed and Remanded for Entry of Corrected Judgments**

J. ROSS DYER, J., delivered the opinion of the court, in which JOHN EVERETT WILLIAMS, P.J. and CAMILLE R. MCMULLEN, J., joined.

Josie S. Holland, Memphis, Tennessee (on appeal); Greg Allen and John Catmur (at trial), for the appellant, Charles Burrow.

Herbert H. Slatery III, Attorney General and Reporter; Zachary T. Hinkle, Assistant Attorney General; Amy Weirich, District Attorney General; and Jeff Jones and Austin Scofield, Assistant District Attorneys General, for the appellee, State of Tennessee.

## OPINION

## Facts and Procedural History

A Shelby County grand jury indicted the defendant, Charles Burrow, for two counts of first degree murder (Counts one and two), two counts of first degree felony murder (Counts three and four), one count of attempted first degree murder (Count five), one count of aggravated burglary (Count six), and one count of employing a firearm during the commission of a dangerous felony (Count seven). Following a jury trial, the defendant was convicted of three counts of second degree murder (Counts one, three, and four), one count of first degree murder (Count two), one count of attempted first degree murder (Count five), one count of aggravated criminal trespass (Count six), and one count of employing a firearm during the commission of a dangerous felony (Count seven). At trial, the State presented the following facts for the jury's review.

In October 2015, Melissa Frans moved with Jodie Davis and her son, Michael Davis. Because Ms. Frans and the defendant had recently ended their five-year relationship, Ms. Davis established a rule that the defendant, who had previously completed home repairs for Ms. Davis, was not allowed in the house while Ms. Frans was staying there.

On the afternoon of October 12, 2015, Ms. Frans was in her bedroom when she heard a "bump on the back side of the wall" followed by several "pops." She then heard Mr. Davis scream, "Charlie, Charlie. Why do you --" followed by several more "pops." Ms. Frans hid in the closet because she realized the defendant was armed and in the house. She held the closet door shut as she tried to call 911. However, the line was busy, and she was unable to get through to an operator. Ms. Frans heard the defendant say, "Where is the f*****g b***h?" He then pulled open the closet door and pointed a .25 caliber pistol at Ms. Frans's head as she begged him not to kill her. She heard a click as the defendant pulled the trigger, but nothing happened. The defendant then tried to shoot himself, but the gun would not fire. He took the magazine out of the gun and "slam[med] it back in" several times but could not get the gun to fire. Finally, he "calmly turn[ed] around and walk[ed] out of the room." Ms. Frans waited in the bedroom until the defendant left. In the living room, she saw the back of Ms. Davis's head on the ground behind the couch. She turned and saw Mr. Davis's feet in the back bedroom before running out of the house.

Molly Minton, Ms. Davis's neighbor, was sitting in her driveway with her mother, Rebecca Holmin, when they heard a sound "like metal hitting metal" coming from the Davis home. A few minutes later they saw the defendant, who Ms. Minton recognized from the neighborhood, come out of the house with a gun in his hand and calmly walk down the street. Ms. Frans also ran out of the house, screaming that the defendant had killed the Davises. As Ms. Holmin attempted to calm Ms. Frans down, Ms. Minton went

into the house to see if she could render aid. However, once she entered the house Ms. Minton saw that both Mr. and Ms. Davis were deceased.

Ralph Haynes had recently purchased a vacant lot next to the defendant's house and was mowing the grass that afternoon when the defendant walked up to him. The defendant was holding two guns in his hands and asked Mr. Haynes if he had been in the military. When Mr. Haynes replied he had been in the Air Force, the defendant said, "Well, you would have done the same thing." The defendant then asked Mr. Haynes to call the police and tell them the defendant had killed two people. The defendant also asked Mr. Haynes to instruct the police to kill him when they arrived. However, after going inside his house for approximately five minutes, the defendant returned and told Mr. Haynes that he did not want the police to kill him because he did not want an innocent police officer to live with that experience.

Officers Jon Alsop and Jimmy Gay with the Memphis Police Department ("MPD") were both responding to the shooting call when the defendant ran into the street and flagged them down. The defendant had his hands in the air and told the officers he "just killed two people." The defendant was taken into custody and placed in Officer Alsop's squad car. The officers proceeded to secure the defendant's house and observed two guns on a coffee table. Officer Gay secured the guns by taking out the live rounds. However, the .25 caliber pistol "was messed up" because Officer Gay could not "rack the slide back." The defendant remained in Officer Alsop's squad car for several hours until he was taken to the detective bureau.

Officer Christopher Peperone with the MPD was the first officer to arrive at the crime scene after the shooting. After speaking with Ms. Frans, Officer Peperone cleared the house and observed the bodies of Ms. Davis in the living room and Mr. Davis in the back bedroom.

Officer Sam Blue with the MPD Crime Scene Investigation Unit responded to both the Davis home on Orchi and the defendant's house on Whittier. At the Davises' house, Officer Blue found two projectiles, one at the corner of the kitchen and the living room and one in a door jamb. He also discovered two spent shell casings, one underneath Ms. Davis and one in the back bedroom near Mr. Davis. At the defendant's house, Officer Blue recovered the two weapons Officers Alsop and Gay found on the coffee table.

Special Agent Cervinia Braswell, a forensic scientist with the Firearms Identification Unit of the TBI and an expert in firearms identification, analyzed the firearms, projectiles, and shell casings recovered in this case. Both weapons were in operating condition, and test fired bullets and casings were compared to the evidence

collected at the scene. Special Agent Braswell determined the two spent shell casings were fired from the defendant's .25 caliber pistol and the two projectiles were fired from the defendant's .38 caliber revolver.

Dr. Marco Ross, the deputy chief medical examiner and forensic pathologist at the West Tennessee Regional Forensic Center, performed the autopsies on both Mr. and Ms. Davis. Dr. Ross found Ms. Davis suffered three gunshot wounds fired from an undetermined range. The first gunshot wound was to the right upper back region. The bullet continued through her chest and exited through her right breast. Because the bullet did not go through any vital organs or major vessels, this wound would not have been immediately fatal. The second bullet entered at Ms. Davis's mid back, going through her right sixth costovertebral joint and lodging in the right breast. This gunshot wound would have been fatal within minutes. Ms. Davis also suffered a gunshot wound to the outer right part of her sixth rib. This bullet went through the left lung, heart, and sternum before lodging in the soft tissue at the front of the chest wall. This wound would also have been fatal within minutes. Finally, Ms. Davis had an abrasion on her right wrist that Dr. Ross opined "could possibly represent a gunshot graze wound." Ms. Davis's toxicology report was negative for alcohol and drugs.

Dr. Ross found Mr. Davis also suffered from three gunshot wounds. The first gunshot wound was to the base of his neck. The bullet went through the left collar bone, aortic arch, left main bronchitis, left lung, esophagus, and right lung before lodging in the muscular tissues of the right flank. This wound would have been fatal within minutes. The second bullet entered on the left front part of the chest and travelled through the left lung and heart before exiting near the middle of his back. The wound would have been fatal within minutes and was fired "anywhere from within half an inch to upwards of three to four feet." Mr. Davis also suffered a gunshot wound to the back of the right shoulder. This bullet went through the soft tissue and muscle of his right shoulder before exiting his right shoulder. With proper medical attention, this wound would not have been fatal. Finally, Mr. Davis had a graze wound on the inner part of his right thigh. His toxicology report indicated the presence of marijuana and alcohol, with a blood alcohol concentration of .182.

A trial, the State called Melissa Frans, Molly Minton, Rebecca Holmin, Ralph Haynes, Officer Sam Blue, Officer Christopher Peperone, Officer Jon Alsop, Officer Jimmy Gay, Special Agent Cervinia Braswell, and Dr. Marco Ross as witnesses, and all rendered testimony consistent with the foregoing. Clayton Davis, Ms. Davis's brother, identified photographs of the victims and indicated he last spoke with Ms. Davis a few days before she died.

The defendant testified on his own behalf, asserting he acted in self-defense. The defendant stated he was drinking with some friends in the park that afternoon and returned home to get some headache medication. As he entered the house, the defendant first noticed his dog was in the backyard, which was unusual. When he reached for the headache medicine, it was missing, as was his .25 caliber pistol. The defendant assumed Ms. Frans had come into the house and taken the items because she still had a key. He placed his .38 caliber revolver in his pocket and walked to the Davises' house to confront Ms. Frans about the missing items. The defendant denied intending to harm anyone and insisted he only wanted his property back. The defendant testified he knocked on the front door, and Ms. Davis told him to come in. When he entered the house, he saw Mr. Davis in the hallway with the defendant's .25 caliber pistol in his hand. Mr. Davis ran toward him, and a scuffle ensued. During the altercation, the defendant claimed the guns went off several times. The defendant testified he saw Ms. Frans sitting on the floor in her bedroom afterward but did not speak to her. When the defendant left, he stated Ms. Davis's body was in the living room and Mr. Davis's was near the front door. On cross-examination, the defendant acknowledged he should have called the police after realizing his gun was missing. He could not explain why Mr. Davis's body was found in the bedroom and not by the front door. The defendant also stated he wanted to tell police "the whole story" but could not because they "didn't give [him] a chance."

Following deliberations, the jury found the defendant guilty of two counts of second degree murder with regards to his actions against Ms. Jodie Davis (Counts one and three), first degree murder and second degree murder with regards to his actions against Mr. Michael Davis (Counts two and four), attempted first degree murder with regards to his actions against Melissa Frans (Count five), aggravated criminal trespass (Count six), and employing a firearm during the commission of a dangerous felony (Count seven). Following a sentencing hearing, the trial court imposed an effective sentence of life imprisonment plus six years.

The defendant filed a timely motion for new trial in which he argued the evidence at trial was insufficient to support the jury's verdicts, the jury returned improper verdicts, and the State erred in improperly commenting on the defendant's right to remain silent. The trial court denied the motion, and this timely appeal followed.

***Analysis***

## I.    Sufficiency

On appeal, the defendant first argues the evidence was insufficient to support his convictions for first degree murder, second degree murder, employment of a firearm

during the commission of a dangerous felony, and aggravated criminal trespass.[1]  The State counters that the evidence was sufficient.  We agree with the State.

When the sufficiency of the evidence is challenged, the relevant question of the reviewing court is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."  *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *see also* Tenn. R. App. P. 13(e) ("Findings of guilt in criminal actions whether by the trial court or jury shall be set aside if the evidence is insufficient to support the findings by the trier of fact of guilt beyond a reasonable doubt."); *State v. Evans*, 838 S.W.2d 185, 190-92 (Tenn. 1992); *State v. Anderson*, 835 S.W.2d 600, 604 (Tenn. Crim. App. 1992).  All questions involving the credibility of witnesses, the weight and value to be given the evidence, and all factual issues are resolved by the trier of fact.  *State v. Pappas*, 754 S.W.2d 620, 623 (Tenn. Crim. App. 1987).  "A guilty verdict by the jury, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the State."  *State v. Grace*, 493 S.W.2d 474, 476 (Tenn. 1973).  Our Supreme Court has stated the following rationale for this rule:

> This well-settled rule rests on a sound foundation.  The trial judge and the jury see the witnesses face to face, hear their testimony and observe their demeanor on the stand.  Thus, the trial judge and jury are the primary instrumentality of justice to determine the weight and credibility to be given to the testimony of witnesses.  In the trial forum alone is there human atmosphere, and the totality of the evidence cannot be reproduced with a written record in this Court.

*Bolin v. State*, 405 S.W.2d 768, 771 (Tenn. 1966) (citing *Carroll v. State*, 370 S.W.2d 523 (Tenn. 1963)).  "A jury conviction removes the presumption of innocence with which a defendant is initially cloaked and replaces it with one of guilt, so that on appeal a convicted defendant has the burden of demonstrating that the evidence is insufficient."  *State v. Tuggle*, 639 S.W.2d 913, 914 (Tenn. 1982).

## A.     First Degree Murder (Count Two)

The jury convicted the defendant of first degree murder for the death of Michael Davis.  First degree murder is "a premeditated and intentional killing of another."  Tenn. Code Ann. § 39-13-202 (a)(1).  In this context, premeditation is "an act done after the exercise of reflection and judgment."  Tenn. Code Ann. § 39-13-202 (d).  Tennessee Code Annotated section 39-13-202 (d) further states:

---

[1] The defendant does not challenge his conviction for attempted first degree murder (Count five).

"Premeditation" means that the intent to kill must have been formed prior to the act itself. It is not necessary that the purpose to kill preexist in the mind of the accused for any definite period of time. The mental state of the accused at the time the accused allegedly decided to kill must be carefully considered in order to determine whether the accused was sufficiently free from excitement and passion as to be capable of premeditation.

*Id.* "The element of premeditation is a question for the jury which may be established by proof of the circumstances surrounding the killing." *State v. Young*, 196 S.W.3d 85, 108 (Tenn. 2006) (citing *State v. Bland*, 958 S.W.2d 651, 660 (Tenn. 1997)). The Tennessee Supreme Court has identified certain factors which tend to support a finding of premeditation, including: "the use of a deadly weapon upon an unarmed victim; the particular cruelty of the killing; declarations by the defendant of an intent to kill; evidence of procurement of a weapon; preparations before the killing for concealment of the crime, and calmness immediately after the killing." *Bland*, 958 S.W.2d at 660 (citing *State v. Brown*, 836 S.W.2d 530, 541-42 (Tenn. 1992); *State v. West*, 844 S.W.2d 144, 148 (Tenn. 1992)). *Bland* does not include an exhaustive list of factors for consideration when finding premeditation. *State v. Adams*, 405 S.W.3d 641, 663 (Tenn. 2013). A conclusion the killing was premeditated may also be supported by the nature of the killing or evidence establishing a motive. *Id*. Likewise, lack of provocation by the victim, failure to render aid, and destruction or secretion of evidence may also support an inference of premeditation. *State v. Larkin*, 443 S.W.3d 751, 815-16 (Tenn. Crim. App. 2013) (internal citations omitted).

Here, the defendant does not dispute that he shot Mr. Davis. Instead, the defendant argues the evidence submitted at trial showed he acted in self-defense, and the State did not negate this claim. A person may use deadly force in self-defense when that person has a reasonable belief, based upon reasonable grounds, that there is an imminent, real danger of death or serious bodily injury. Tenn. Code Ann. § 39-11-611(b)(2). "[W]hether an individual acted in self-defense is a factual determination to be made by the jury as the sole trier of fact." *State v. Goode*, 956 S.W.2d 521, 527 (Tenn. Crim. App. 1997). It is within the jury's prerogative to reject a claim of self-defense. *Id.*

The defendant contends his testimony, the crime scene, and Dr. Ross's autopsy report support the defendant's theory of self-defense. At trial, the defendant testified Mr. Davis charged him with the .25 caliber pistol as the defendant entered the house, causing an altercation that resulted in Mr. Davis being shot three times. He asserts his testimony is corroborated by the location of shell casings in the living room, the location of the projectile in the door jamb, the trail of blood leading into the back bedroom, and Dr.

Ross's testimony that the victims' gunshot wounds were from varying angles and distances. In addition, Ms. Frans testified she heard a bump on the wall before the shooting began.

However, despite the defendant's claim, other evidence presented at trial established the defendant did not act in self-defense. Ms. Frans testified she heard Mr. Davis say "Charlie. Charlie. Why do you --" before hearing several gunshots. She also testified the defendant put a gun to her head, pulled the trigger, and calmly walked away after the gun jammed. Ms. Minton and Ms. Holmin also described the defendant's demeanor as calm directly after the shooting. Moreover, Mr. Davis's body was found in the back bedroom despite the defendant's testimony that the body was near the front door when he left the house. Officer Blue found a shell casing near Mr. Davis's body, supporting the theory that he was shot in the bedroom and not in the living room. Finally, Dr. Ross testified Mr. Davis suffered two gunshot wounds to the back, further negating the defendant's claim of self-defense. By its verdict, the jury rejected the defendant's claim that he shot Mr. Davis in self-defense and accredited the State's witnesses. *Goode*, 956 S.W.2d at 527. The defendant is not entitled to relief on this issue.

The defendant also argues the State did not prove he acted with intent and premeditation or that Mr. Davis's death was free from excitement and passion. Specifically, the defendant argues his mental health prevented his actions from being premeditated and intentional, and his actions were not sufficiently free from excitement and passion because he believed Ms. Frans and Mr. Davis had broken into his house and stolen his gun. The record, however, does not support this argument.

Instead, the evidence shows that on October 12, 2015, the defendant walked three blocks to the victims' house, where Ms. Frans had been living since her break-up with the defendant, armed with a .25 caliber pistol and .38 caliber revolver. He entered the house and shot Ms. Davis in the back three times. He then walked to the back bedroom and shot Mr. Davis three times, twice in the back and once in the chest. He found Ms. Frans hiding in a bedroom closet, put a gun to her head, and pulled the trigger. However, the gun jammed, and, after attempting to shoot himself, the defendant calmly walked back to his house and told a neighbor to call the police.

Looking specifically to the premeditation factors outlined by our Supreme Court, the record establishes the defendant caught Mr. Davis by surprise and shot him in mid-sentence. Ms. Frans testified she did not believe Mr. Davis owned a gun. Following the shootings, the defendant did not attempt to render aid to the victims and, instead, walked several blocks to his house before asking someone to contact the police. Furthermore, multiple witnesses commented on the defendant's calm demeanor following the

- 8 -

shootings. *See Bland*, 958 S.W.2d at 660; *Larkin* 443 S.W.3d 816. Accordingly, the record is sufficient to establish the defendant committed the premeditated murder of Mr. Davis.

Though the defendant testified he was upset at the thought of Ms. Frans and Mr. Davis stealing guns from his house, the record does not support a finding that he committed the murder in the heat of passion. Rather, the evidence shows the defendant walked into the victims' house with two guns, shot Mr. and Ms. Davis, attempted to shoot Ms. Frans, and, when that failed, calmly walked out of the house and back home. Ms. Minton and Ms. Holmin described the defendant's demeanor as "calm" and "nonchalant" as he left the victims' house. The defendant is not entitled to relief on this issue.

## B.    Second Degree Murder (Count One)

The jury convicted the defendant of second degree murder for the death of Ms. Jodie Davis. Second degree murder is the "knowing killing of another." Tenn. Code Ann. § 39-13-210(a)(1). Second degree murder is a result-of-conduct offense. *State v. Page*, 81 S.W.3d 781, 787 (Tenn. Crim. App. 2002). Therefore, a person acts knowingly "when the person is aware that the conduct is reasonably certain to cause the result." Tenn. Code Ann. § 39–11–302(b) (2014). "[T]he 'nature of the conduct' that causes death is inconsequential." *Page*, 81 S.W.3d at 787. A knowing intent is shown if the defendant acts with an awareness that his conduct is reasonably certain to cause the victim's death. *See id*. at 790-93. Whether a defendant acted "knowingly" is a question of fact for the jury. *State v. Inlow,* 52 S.W.3d 101, 104-105 (Tenn. Crim. App. 2000). In assessing the defendant's intent, the jury may rely on "the character of the assault, the nature of the act and [on] all the circumstances of the case in evidence." *Id*. at 105 (citing S*tate v. Holland*, 860 S.W.2d 53, 59 (Tenn. Crim. App. 1993)).

The defendant argues the evidence presented at trial does not support a finding that he knowingly killed Ms. Davis. Instead, because the defendant testified he accidentally shot Ms. Davis during his altercation with Mr. Davis, he asserts he acted recklessly or negligently, but not knowingly. We respectfully disagree.

The evidence, considered in the light most favorable to the State, showed the defendant was forbidden from coming to the victims' house while Ms. Frans was staying there. However, on the afternoon of October 12, 2015, the defendant walked into the victims' house and shot Ms. Davis three times in the back as she stood in the living room. He then proceeded to shoot her son, Mr. Davis, before searching for Ms. Frans. Based on the evidence, a rational jury could find second degree murder beyond a reasonable doubt. Although the defendant testified he accidentally shot Ms. Davis during his altercation

with Mr. Davis, the jury rejected this theory when reaching its verdict. The defendant is not entitled to relief on this issue.

## C.   Employment of a Firearm During the Commission of a Dangerous Felony (Count Seven)

As charged in Count seven, "[i]t is an offense to employ a firearm during the . . . [c]ommission of a dangerous felony." Tenn. Code Ann. § 39-17-1324(b)(1). One such "dangerous felony" is attempted second degree murder. Tenn. Code Ann. § 39-17-1324(b)(2), (i)(1)(B). The term "employ" means "to make use of." *State v. Fayne*, 451 S.W.3d 362, 370 (Tenn. 2014). The evidence at trial showed the defendant found Ms. Frans hiding in a closet. He put a gun to head and pulled the trigger as she begged for her life. The gun jammed, and the defendant, unable to get the gun to fire, left the house. Therefore, the evidence is sufficient to support the defendant's conviction.

The defendant notes he was indicted for employment of a firearm during the commission of attempted first degree murder but convicted of employment of a firearm during the commission of attempted second degree murder. A jury may find a defendant guilty of employing a firearm for a lesser-included offense of the dangerous felony listed in the indictment if both felonies are an enumerated felony under the statute. *State v. Shawn Thompson*, No. M2013-01274-CCA-R3-CD, 2014 WL 2609535, at *5-6 (Tenn. Crim. App. Mar. 11, 2014), *no perm. app. filed*. Both attempted first degree and attempted second degree murder are qualifying felonies. *See* Tenn. Code Ann. § 39-17-1324(i)(1)(A)-(B). In addition, the defendant argues he was not convicted of attempted second degree murder and, therefore, cannot be convicted of employing a firearm during the commission of attempted second degree murder. However, this Court previously held a defendant could be found guilty of employing a firearm during the commission of a dangerous felony, even if not convicted of the same stand-alone felony. *See State v. Demetrius Pirtle and Cordarius R. Maxwell*, No. W2014-02222-CCA-R3-CD, 2016 WL 4009712, at *8-9 (Tenn. Crim. App. July 22, 2016), *perm. app. denied* (Tenn. Nov. 22, 2016) (upholding the defendant's convictions of attempted second degree murder and employing a firearm during the commission of attempted first degree murder when the evidence established guilt for both offenses). The defendant is not entitled to relief on this issue.

## D.   Aggravated Criminal Trespass (Counts Three, Four, and Six)

With respect to the defendant's conviction for aggravated criminal trespass, Tennessee Code Annotated section 39-14-406 provides:

(a) A person commits aggravated criminal trespass who enters or remains on property when:

 (1) The person knows the person does not have the property owner's effective consent to do so; and

(2) The person intends, knows, or is reckless about whether such person's presence will cause fear for the safety of another; or

(3) The person, in order to gain entry to the property, destroys, cuts, vandalizes, alters or removes a gate, signage, fencing, lock, chain or other barrier designed to keep trespassers from entering the property.

For the purpose of the statute, "enter" means "intrusion of the entire body." Tenn. Code Ann. § 39-14-406(b).

Here, the defendant argues Ms. Frans was the only witness who testified Ms. Davis had forbidden the defendant from coming to the house, while the defendant testified he identified himself at the door and was given permission to enter. However, by finding the defendant guilty, the jury accredited the testimony of Ms. Frans and discounted the testimony of the defendant, and this Court will not re-evaluate those findings on appeal. *Bland*, 958 S.W.2d at 659.

Ms. Frans testified she moved into Ms. Davis's house two weeks prior to the shooting. Because Ms. Frans and the defendant were ending their romantic relationship, Ms. Davis would not allow the defendant to come to the house while Ms. Frans was there. On the afternoon of the shooting, the defendant entered the house without permission and proceeded to shoot Mr. and Ms. Davis before attempting to shoot Ms. Frans. Based on the evidence, a rational jury could find aggravated criminal trespass beyond a reasonable doubt.

The defendant also notes the jury initially returned verdicts for second degree murder in perpetration of an aggravated criminal trespass for Counts three and four. The trial court sent the jury back to deliberate further on Count four, and the jury returned a verdict of second degree murder. However, this issue is not properly supported by argument and is, therefore, waived. Tenn. Ct. Crim. App. R. 10(b). Regardless, as noted above, the evidence presented at trial was sufficient to support convictions of second degree murder for both Mr. and Ms. Davis.

## II. Inconsistent Verdicts

The defendant next argues the jury's decision to acquit him of aggravated burglary is inconsistent with the decision to convict him of premeditated first degree murder and attempted first degree murder. The State contends inconsistent verdicts are not a basis for relief. We agree.

The Tennessee Supreme Court has long held that inconsistent verdicts are allowed:

> Consistency in verdicts for multiple count indictments is unnecessary as each count is a separate indictment . . . . An acquittal on one count cannot be considered *res judicata* to another count even though both counts stem from the same criminal transaction. This Court will not upset a seemingly inconsistent verdict by speculating as to the jury's reasoning if we are satisfied that the evidence establishes guilt of the offense upon which the conviction was returned.

*Wiggins v. State*, 498 S.W.2d 92, 93–94 (Tenn. 1973). More recently, the Tennessee Supreme Court stated "that '[t]he validity accorded to [inconsistent] verdicts recognizes the sanctity of the jury's deliberations and the strong policy against probing into its logic or reasoning, which would open the door to interminable speculation.'" *State v. Davis*, 466 S.W.3d 49, 77 (Tenn. 2015) (quoting *United States v. Zane*, 495 F.2d 683, 690 (2nd Cir. 1974)). Therefore, we conclude the defendant is not entitled to relief on this issue.

## III. Improper Statements

Finally, the defendant contends the State made several statements which constituted misconduct, prejudicing the outcome of the trial. The defendant acknowledges he failed to contemporaneously object to the statements and requests review under the plain error doctrine. The State maintains the defendant is not entitled to relief under the plain error doctrine. We agree.

Before an error may be recognized, it "must be 'plain' and it must affect a 'substantial right' of the accused." *State v. Adkisson*, 899 S.W.2d 626, 639 (Tenn. Crim. App. 1994). "An error would have to [be] especially egregious in nature, striking at the very heart of the fairness of the judicial proceeding, to rise to the level of plain error." *State v. Page*, 184 S.W.3d 223, 231 (Tenn. 2006). In *State v. Smith*, our Supreme Court adopted *Adkisson*'s five-factor test for determining whether an error should be recognized as plain:

(a) The record must clearly establish what occurred in the trial court;

(b) A clear and unequivocal rule of law must have been breached;

(c) A substantial right of the accused must have been adversely affected;

(d) The accused did not waive the issue for tactical reasons; and

(e) Consideration of the error is "necessary to do substantial justice."

24 S.W.3d 274, 282-83 (Tenn. 2000) (quoting *Adkisson*, 899 S.W.2d at 641-42). "[A]ll five factors must be established by the record before this Court will recognize the existence of plain error, and complete consideration of all the factors is not necessary when it is clear from the record that at least one of the factors cannot be established." *Id.* at 283.

The established test for determining whether prosecutorial error based on improper comments amounts to reversible error is whether the conduct was so improper, or the argument so inflammatory, that it affected the verdict. *See State v. Reid*, 164 S.W.3d 286, 344 (Tenn. 2005); *State v. Goltz*, 111 S.W.3d 1, 5 (Tenn. Crim. App. 2003). In assessing whether comments made by the prosecution are so inflammatory or improper as to affect the verdict, the court must consider five factors:

(1) The conduct complained of viewed in the context and the light of the facts and circumstances of the case;

(2) The curative measures undertaken by the court and the prosecution;

(3) The intent of the prosecutor in making the improper statements;

(4) The cumulative effect of the improper alleged conduct and any other errors in the record; and

(5) The relative strength or weakness of the case.

*Judge v. State*, 539 S.W.2d 340, 344 (Tenn. Crim. App. 1976); see also *Goltz*, 111 S.W.3d at 5-6.

## A.     Right to Remain Silent

Based on the following exchange, the defendant contends the State, while cross-examining the defendant, improperly commented on the defendant's right to remain silent.

DEFENDANT:     Yeah.  But I wanted to tell them the whole story, but --

PROSECUTOR:     Well, you wanted to, but you didn't right?

DEFENDANT:     N'all.  They didn't give me a chance.

PROSECUTOR:     How did they not give you a chance?

DEFENDANT:     Because they put me in the back of the police car and shut the door.

PROSECUTOR:     They never talked to you after that?

DEFENDANT:     No.

PROSECUTOR:     When you were sitting back there -- the three hours that you were there?

DEFENDANT:     No.  He got up front and sit there different times.  A lot of times he was outside the police car.

PROSECUTOR:     At any time when he was in there you could have talked to him, right?  I mean, you're not obligated to I understand that, but you could.  If you wanted to tell your side of the story you could have done that.  It might not have been the best idea.

Although the defendant did not contemporaneously object to this line of questioning, he did argue in his motion for new trial that the State improperly commented on his right to remain silent.  However, at the motion hearing, trial counsel admitted, "I will state on the record I did not make [an objection at] trial as a tactical decision.  I didn't want to draw any additional light to this."  Because the defendant waived this issue for tactical reasons, he is not entitled to relief under the plain error doctrine.

## B.     Jammed Gun

During his rebuttal closing argument, the prosecutor stated:

For whatever reason this gun decides to stop working.  Jammed perhaps.  It is in working order when TBI gets in touch with it, yes.  They've had time to remove any jams.

The defendant claims the prosecutor argued misleading facts and vouched for the credibility of Ms. Frans by resolving any discrepancies between her testimony and Special Agent Braswell's. The State contends the prosecutor's statements were consistent with the proof, and he did not personally vouch for Ms. Fran's credibility.

Here, consideration of the prosecutor's statement is not necessary to do substantial justice in light of the overwhelming evidence submitted at trial. The State provided both eyewitness testimony and physical evidence linking the defendant to the crime. Ms. Frans testified she was in the bedroom when she heard gunshots. The defendant entered the bedroom where she was hiding, put a pistol to her head, and pulled the trigger, only leaving when the gun jammed. Ms. Frans's testimony was corroborated by Officer Gay, who testified the .25 caliber pistol was "messed up" because he could not "rack the slide back" when unloading the bullets. Forensic evidence linked the bullets and casings found at the scene to the defendant's guns, which were recovered at the defendant's house. Moreover, the trial court instructed the jury to follow the law, not the opinions of the attorneys, and we presume the jury followed those instructions. *State v. Robinson*, 146 S.W.3d 469, 494 (Tenn. 2004). Accordingly, we conclude the prosecutor's statements do not rise to the level of plain error and, therefore, the defendant is not entitled to relief on this issue.

## C.    The Bolshevik Revolution

During rebuttal, the prosecutor made the following statements:

> One hundred years ago yesterday a group of Russians, otherwise known as the Bolshevik[s], overthrew the provisional government of Russia. They were led by a couple of guys mainly. A guy by the name of Lenin and a guy by the name of Trotsky. Those two guys led this revolution for years. They choose to be there. In the right spot at the right time they snatched the provisional government to take over Russia what is known as, what we know it as, the Russian Communist Party. They choose to be there. They had a plan.
>
> They fulfilled that plan with ruthless efficiency. They were not someone you wanted to play with. [The defendant] is also similarly situated. He chooses to be here. Because he had a plan to walk over to that address on Orchi with two guns as a man scorned by Melissa Frans with the intent to kill her.

He plans it.  He gets the tools he needs to carry out the job.  Walks over there three blocks.  Comes in something is wrong with this plan.

. . .

He eliminates the first witness because now [the defendant's] plan has changed because he comes up on a surprise.  Oh no.  The provisional government had guards at the door.

Melissa Frans is our provisional government.  Her guards, using the term very broadly, are Jodie and Michael Davis.

. . .

Then what does [the defendant] do he comes to another door.  Walks down that hall and comes to another door.  And that door is the provisional government, Melissa Frans.

. . .

Two Gun Charlie I don't need a shotgun.  He's not going to actually storm the winter house in Bolshevik.  It's not guarded by a battalion of solders (sic).  He's going to someone's house.  Might not know who's in there, but should be sufficient.

The defendant argues these statements were prejudicial and calculated to confuse the jury as to holes in the State's proof.  The State contends the prosecutor's argument was simply ineffective.

Here, the prosecutor's statements were not so inflammatory as to affect the outcome of the trial.  While the statements do not rise to the level of affecting the verdicts in this case, we must caution the State from using such analogies at trial.  The prosecutor's multiple references to Lenin, Trotsky, and the Bolshevik Revolution likely confused the jury.  However, as discussed above, given the strength of the State's evidence against the defendant, it is not likely the prosecutor's statements affected the jury's decision.  Therefore, consideration of the prosecutor's statements is not necessary to do substantial justice.  The defendant is not entitled to relief on this issue.

Finally, we detect some errors in the entry of the judgment forms in this case.  At the motion for new trial hearing, the trial court found that Count three merged with Count one and Count four merged with Count two, and we agree.  However, this is not reflected

- 16 -

in the judgment forms.  Therefore, we must remand the case to the trial court for entry of corrected judgment forms indicating the mergers.  *See State v. Berry*, 503 S.W.3d 360, 364 (Tenn. 2015) ("The judgment document for the lesser (or merged) conviction should reflect the jury verdict on the lesser count and the sentence imposed by the trial court. Additionally, the judgment document should indicate in the 'Special Conditions' box that the conviction merges with the greater conviction.  To avoid confusion, the merger also should be noted in the 'Special Conditions' box on the uniform judgment document for the greater or surviving conviction.").  In addition, although the trial court ordered Counts one, two, three, four, five, and six to run concurrent to each other, the judgment forms for Counts one, two, three, four, and five do not reflect this.  On remand, the judgment forms should be corrected to indicate that Counts one, two, three, four, five, and six run concurrently.

### *Conclusion*

For the aforementioned reasons, the judgments of the trial court are affirmed. However, we remand this case for entry of corrected judgments as specified in this opinion.

_____
J. ROSS DYER, JUDGE

- 17 -